IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 1, 2017

**STATE OF TENNESSEE v. MARIO PATTERSON**

**Appeal from the Criminal Court for Shelby County**
No. 14-01032      Chris Craft, Judge

————————————————————

**No. W2016-02080-CCA-R3-CD**

————————————————————

A Shelby County jury convicted the Defendant, Mario Patterson, of first degree felony murder, and the trial court imposed a mandatory life sentence. On appeal, the Defendant asserts that the State failed to prove that he intended to commit a robbery and, therefore, he was improperly convicted of first degree felony murder. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Laurie W. Hall, Memphis, Tennessee, for the appellant, Mario Patterson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Tracye Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Shelby County grand jury indicted the Defendant and his co-defendant, Dondre Johnson for the first degree felony murder of David Santucci, the twenty-seven-year old victim. The Defendant's and co-defendant's cases were severed, and the Defendant's case proceeded to trial. At trial, the parties presented the following evidence: Steven Ferguson worked as a bouncer at the nightclub Rumba Room on August 12, 2013. Mr. Ferguson was standing outside the Rumba Room with some co-workers, smoking, at around 1:45 a.m. on August 12. Mr. Ferguson observed a Pontiac driving south on South Main Street, make a U-turn on South Main Street, and begin driving north. The car appeared to back up "like they was fixin to park" and then Mr. Ferguson heard a gunshot.

He immediately looked down the street and saw a man hop into the Pontiac and then the Pontiac "peeled out" and turned off of South Main Street onto Pontotoc Street.

After observing the Pontiac drive away, Mr. Ferguson and another security guard walked ten to twenty feet down the street and saw the victim lying on the ground with a gunshot wound to his chest. Two "girls" had followed the men down the street, and the other security guard asked one of them to call the police and the other to apply pressure to the victim's wound. The victim attempted to speak but was unable to do so. Mr. Ferguson and the other security guard provided a description of the car to the police, and the Pontiac was located shortly thereafter. On cross-examination, Mr. Ferguson agreed that the nearest street light was off when the shooting occurred.

Taneshia Lawrence was sitting with two friends outside the Rumba Room nightclub in the early morning hours of August 12, 2013. While waiting for some others to join them, she noticed a "greenish-silver" Pontiac Grand Am driving down South Main Street with a black female driving, and she also noticed the victim walking down the street. She saw the victim talking with a man who wore his hair in dreadlocks. She turned to her friends and then heard a gunshot coming from the direction she had seen the two men speaking. She looked down the street and saw the Pontiac speed away and turn onto Pontotoc Street. Before the vehicle sped away, Ms. Lawrence observed the man wearing his hair in dreadlocks "jump" in the back passenger side of the Pontiac. She also saw two people, a male and a female, in the front seat of the Pontiac with the male now driving.

Ms. Lawrence walked down the street and saw the victim lying on the ground. She knelt down next to him and tried to comfort him. The victim did not say anything to Ms. Lawrence but held her hand "extremely tight" and appeared to be trying to catch his breath. Ms. Lawrence remained with the victim until the ambulance arrived and then spoke with police providing a statement about what she had witnessed.

Sharae Robertson was at the Rumba Room in the early morning hours of August 12, 2013, and standing outside when she heard a gun fire. She then saw a "green" Pontiac Grand Am speed down South Main Street and make a left on to Pontotoc Street. She saw the "shadows" of the heads of three people in the Pontiac. Ms. Robertson walked down the street and found the victim lying on the ground between a black truck and a burgundy car. Ms. Robertson applied pressure to the victim's chest wound and attempted to comfort the victim along with Ms. Lawrence. Ms. Robertson remained with the victim until the police arrived.

Ashton Britton, a Memphis Police Department ("MPD") officer, heard the dispatch providing a vehicle description linked to the shooting on South Main Street. He

drove to the Foote Homes apartment complex to look for the vehicle matching the description. As he drove around, he noticed a vehicle with the parking lights on. He approached the vehicle, initially, to see if it had broken down. He did not see anyone in the vehicle until he was "right up on the vehicle" and saw people "ducked down" inside. He immediately drew his gun and ordered the occupants to sit up with their hands up. At this point, Officer Britton realized that the car matched the description provided by dispatch. The back seat passenger, the co-defendant, attempted to exit the vehicle, and Officer Britton ordered him to remain in the car. The Defendant, who sat in the front passenger seat, kept dropping his hands. On the third time he did so, Officer Britton warned the Defendant that if he dropped his hands again, he would fire. The Defendant complied. Officer Britton called for back-up and, once additional officers arrived, the occupants, two males and one female, were taken into custody. During a search of the vehicle, a gun was recovered from the floor by the front passenger seat where the Defendant had been seated.

Marcus Berryman, an MPD officer, executed a search warrant on the Pontiac. Inside the vehicle he recovered two cell phones, a gun with a magazine, a single live round of ammunition found inside the chamber of the gun, and a ski mask. The magazine contained thirty rounds of live ammunition.

Robert Wilkie, an MPD sergeant in the Homicide Bureau, interviewed the Defendant on August 12, 2013, about the homicide of the victim. The Defendant signed a waiver of his rights and agreed to speak with Sergeant Wilkie. The Defendant indicated that he did not need glasses to read but that he did not read or write "well." Sergeant Wilkie provided the Defendant with a written copy of his rights but also read them to him.

The Defendant told Sergeant Wilkie that he, Jerrica Norfleet, and the co-defendant were out together and "then a bunch of bad stuff happened because he blank[ed] out." The Defendant did not disclose what the "bad stuff" was. The Defendant maintained that he did not know what happened but said that he knew that "Jerrica wasn't the killer and that he wasn't the killer." When asked how he knew that neither he nor Jerrica was "the killer," he responded that he did not know.

During a break, Sergeant Wilkie spoke with the case coordinator who updated him on new information learned through other witnesses. He confronted the Defendant with the new information that indicated that the Defendant was present and active during the shooting. The Defendant told Sergeant Wilkie that he remembered getting out of the car when the co-defendant shot the victim. Sergeant Wilkie began interviewing the Defendant at 9:40 a.m. on August 12, 2013, and at 1:00 p.m. they took a typed statement

from him, with breaks throughout that time period. Sergeant Wilkie read the Defendant's responses:

Q.      Are you aware that the Memphis Police Department is investigating a homicide that happened on August 12, 2013 at 275 South Main Street?

A.      Yes.

Q.      Are you the person responsible for this homicide?

A.      No.

Q.      Do you know who is responsible for this homicide?

A.      Yes.

Q.      Who's responsible for this homicide?

A.      Dondre Johnson.

Q.      Who is Dondre Johnson to you?

A.      My cousin.

Q.      How do you know that Dondre Johnson is the person responsible?

A.      I was there.

Q.      Who else was present?

A.      Jerrica Norfleet-Burns.

Q.      Do you know [the victim]?

A.      No.

Q.      Have you ever seen him before this incident?

A.      No.

4

Q.      What type of weapon was used in this shooting?

A.      Nine-automatic, black, with an extended clip.

Q.      Whose gun is it?

A.      It's mine.

Q.      How long have you had the gun?

A.      About two weeks.

Q.      Where did you get it?

A.      I found it in the dumpster out in Cordova, behind the liquor store.

Q.      Who all was armed during this incident?

A.      Just Dondre.

Q.      Was anyone with [the victim]?

A.      Nope.

Q.      Explain how you and Dondre came to be together last night?

A.      I was in Orange Mound and when I showed up to my mom's house Dondre was there. Dondre just show anytime he wants to.

Q.      What time did you get to your mom's house and how did you get there?

A.      I got to my mom's house at 10:00 o'clock and Jerrica Norfleet, or Burns, took me.

Q.      Who is Jerrica Norfleet Burns, to you?

A.      My friend.

Q.      In your own words describe to me the events that took place, before, during and after the incident on August 12, 2013 at 275 South Main?

5

A.    I pulled up to the house with Jerrica, my cousin Dondre was already there. We sat on the porch and then we smoked and then I asked Jerrica to take us to the store to get some money off of a card so we could get some more weed. So we did that and we ended up riding around downtown. That's when I seen Mr. David and I asked him for a light and he told me, "fuck you nigger" and I said, "fuck you" back. So Mr. David pulled out his keys and started walking fast to his car. Mr. David was already across the street when we turned left. I was going to pull over, because I thought we were going to fist fight. So me, Jerrica and Dondre pulled on the side of Mr. David, I was driving. Dondre hopped out from the back seat and I hopped out the front driver's seat, that's when I heard one gun shot. I seen Mr. David on the ground, using his phone. Then Dondre jumped in the back seat of the car and I jumped on top of Dondre while Jerrica pulled off. Jerrica drove me and Dondre to Foote Homes and that's when the police pulled up and told us to put our hands up. I put my hands up and I thought about running, but the police stopped me when he pointed the gun at me. Backup police arrived and arrested us and put us in three separate cars and brought us to down to 201 Poplar.

Q.    Before the incident with David Santucci you and Dondre came across a heavy set male, black, downtown, explain that?

A.    I seen the heavy set black dude get out of the car and I said to Dondre, "I wonder if he has some money?"

Q.    Did either you or Dondre ever get out on this individual?

A.    No.

Q.    Was this right before you and Dondre saw David Santucci?

A.    Not right before, but I would say about five minutes before.

Q.    The mask that was found in Jerrica's car, where did it come from?

A.    It came from Orange Mound, it was in one of my friend's old backpack that I had put my shoes in and I had seen it.

6

Q.    Why did you give it to Dondre?

A.    I didn't give it to him, it was in the backpack and he went and got it out of the backpack.

Q.    Was anyone wearing the mask when David Santucci was approached?

A.    Nope, I didn't see anyone with it on.

Q.    What kind of car does Jerrica have that all three of you were riding in?

A.    Dark grey, Grand Pontiac.

Q.    While riding around did you and Dondre discuss robbing anyone?

A.    Nope, we didn't discuss robbing anyone, we just talked about how to get some money.

Q.    Have you and Dondre ever talked about robbing someone?

A.    No, we never talked about robbing someone, we just talked about robbing.

Q.    Did Jerrica know what your intentions were when you pulled up on David Santucci?

A.    No, my intentions was fighting, she didn't know nothing.

Q.    When you and Dondre got back in the vehicle, after you heard the shot, what did Dondre say?

A.    He didn't say nothing, it wasn't nothing personal, he didn't know him.

Q.    Have you and Dondre ever done anything like this before?

A.    Nope.

7

Q.   How did the gun get under the front seat where you were sitting at in the car?

A.   I took it from Dondre when I crawled to the front seat from the back.

Q.   Did Dondre have any pictures made with the cell phone, prior to making contact with David Santucci?

A.   Yes.

Q.   Who took the picture?

A.   Jerrica, with her cell phone.

Q.   Are you or Dondre gang affiliated?

A.   Yes, I'm Blood and I don't know if Dondre is affiliated.

Q.   Who had the gun when the police showed up?

A.   I did.

Q.   Why?

A.   Because I took it from Dondre, I took it from him because I was mad that he shot dude.

Q.   Were any demands made to David Santucci?

A.   No.

Q.   Why did you admit to being responsible for this incident involving David Santucci to the police officer on the scene of your arrest?

A.   Because I didn't know Mr. David was dead and I didn't want to see my little cousin or Jerrica get in trouble because of that.

Q.   Is there anything you would care to add to your statement that you feel might aid us in this investigation?

8

A.      I just want to say I'm sorry that it happened like that, because he wasn't supposed to get shot and if I could take it back, I would.

Sergeant Wilkie testified that in his experience as a police officer he has come to understand the term "lick" to mean a robbery.

On cross-examination, Sergeant Wilkie testified that the Defendant's interview began at 9:39 a.m. He confirmed that at the beginning of the Defendant's interview, the Defendant disclosed that he had used marijuana at 9:30 p.m. the previous night and taken a prescribed two-milligram Xanax pill the day before. The Defendant stated that he took the Xanax because he had been diagnosed paranoid schizophrenic.

Sergeant Wilkie confirmed that he interviewed Jerrica Norfleet before he interviewed the Defendant. Based upon the information from both interviews, Sergeant Wilkie learned that Ms. Norfleet had taken a picture of the co-defendant with her cell phone before the shooting. The photograph is part of the record, and in the photograph, the co-defendant is wearing a ski mask and holding a handgun. He agreed that he did not recover any photographs of the Defendant wearing a ski mask or holding a handgun.

On redirect examination, Sergeant Wilkie testified that the Defendant was driving the Pontiac and stopped when the victim was "trying to walk away, fast." He further confirmed that it was the Defendant and the co-defendant who talked about a robbery and it was the Defendant's ski mask and handgun.

Jerrica Norfleet testified that on August 12, 2013, she had been dating the Defendant for a few months. She had met the Defendant in high school and knew the co-defendant because he was the Defendant's cousin. She recalled that on August 12, 2013, the Defendant sent her a text asking her to give him a ride home. Ms. Norfleet agreed and drove the Defendant home. When they arrived, the co-defendant was sitting on the porch waiting for the Defendant. The Defendant asked Ms. Norfleet to go inside the house while he and the co-defendant spoke on the porch. She estimated that the two men remained outside for fifteen or twenty minutes while she watched television. When the two men came inside, the Defendant asked Ms. Norfleet if she would wait for him at the house while he and the co-defendant walked "somewhere." She agreed and the two men were gone for about thirty minutes.

When the Defendant and the co-defendant returned, they ate and played dominoes. After awhile, the Defendant asked Ms. Norfleet to drive them to the store. The Defendant and co-defendant went into the "corner store" and purchased a "black and mild." The group then drove around while the Defendant and co-defendant took turns using the Defendant's phone to call different people to find out about "a lick." Ms.

9

Norfleet said that at the time she did not know what "a lick" was but that she now understood that term to reference a robbery. At some point, Ms. Norfleet became frustrated with driving aimlessly around and asked the Defendant to drive. The Defendant got into the driver's seat, and Ms. Norfleet sat in the front passenger seat while the co-defendant remained in the back seat positioned behind the driver's seat.

As they drove around, Ms. Norfleet saw the Defendant hand a gun to the co-defendant. Ms. Norfleet had seen the Defendant with a gun before but not the gun she saw that night. The co-defendant asked Ms. Norfleet for her cell phone, and she declined to give it to him but instead took a photograph of the co-defendant as the Defendant drove around. Ms. Norfleet identified the photograph she took of the co-defendant wearing a ski mask and holding the gun.

By this point, the Defendant was driving downtown, and the Defendant and co-defendant were discussing potential victims on the street. Ms. Norfleet recalled seeing an older couple and the Defendant's saying, "I bet they got some money." The couple, however, was in the midst "of a crowd," so they were passed by. Ms. Norfleet became suspicious of the Defendant and co-defendant's behavior and asked "What ya'll got going on?" Her question came "too late," however, because the Defendant turned the corner where the victim was standing.

The victim was identified as someone who "got some money" because "he looked as if he was frightened, . . . so he started to speed up with his walk." The Defendant turned the car left, and the co-defendant got out. The Defendant finished parking the car and then got out of the car. Both the Defendant and co-defendant were approaching the victim when the victim yelled, "Get the f**k out of here." The co-defendant responded, "What do you mean, get the f**k out of here?" and then he fired the gun. Ms. Norfleet "panicked" and moved into the driver's seat to speed away. She said that she intended to leave the men behind, but the Defendant and co-defendant both "jumped into the backseat." Ms. Norfleet made a "quick left" onto Pontotoc Street from South Main Street. The Defendant directed Ms. Norfleet to the Foote Homes area.

Ms. Norfleet testified about the conversation in the car following the shooting as "a lot of rage." She said that the co-defendant stated, "That MF'r, hollered, get the f**k out of here, I should of shot that n***er three more times." The Defendant responded, "We didn't even get s**t off of him." The Defendant instructed Ms. Norfleet to back into an area, park, and turn off the lights. She tried to do so, but apparently the parking lights remained on. The Defendant climbed back into the front seat and told the co-defendant to give him the gun. As they sat in the dark car, the two men said that the "police [were] going to flood the area" so to "sit still" and "hopefully it [would] clear soon."

10

A police car turned into the apartment complex, and the officer parked his car in front of the Pontiac. The police officer approached the car and saw Ms. Norfleet, the Defendant, and the co-defendant "slumped down" and ordered them to sit up and get their hands up. At this point, the Defendant told the co-defendant to try to run. The two began arguing because the co-defendant was afraid he would be shot. Ms. Norfleet recalled that the police officer was "basically, frightened, not knowing what was going on, because he saw them trying to get out of the car. He told us that if he [moved], he would put a bullet in all our heads. And because I was scared, I told [the Defendant] to just, please let him do what he had to do." Additional police officers arrived, and all three were taken into custody.

Ms. Norfleet agreed that she had not been indicted for facilitation of first degree murder.

Erica Curry, a medical examiner, testified as an expert witness in the field of forensic pathology. Dr. Curry performed the autopsy on the victim. During the examination, Dr. Curry observed an entrance wound on the left side of the victim's heart. The bullet traveled through the victim's aorta, diaphragm, liver, stomach, kidney and exited on the right side of the victim's back. The toxicology report indicated the presence of alcohol and marijuana metabolites in the victim's system. Based upon the examination, Dr. Curry determined that the cause of death was the gunshot wound to the victim's chest and that the manner of death was homicide.

Eric Warren, a Tennessee Bureau of Investigation forensic scientist, testified as an expert witness in the field of firearms identification. Special Agent Warren was provided with a firearm, a magazine, several cartridges, one cartridge case, and one bullet recovered during the course of the investigation. His findings were that the cartridge case and the bullet recovered at the crime scene had been fired from the Defendant's gun.

After hearing the evidence, the jury convicted the Defendant of first degree felony murder, and the trial court imposed a mandatory life sentence. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient. He argues that the State failed to prove that he intentionally engaged in or intended to commit a robbery. The State responds that there was sufficient evidence to support the Defendant's conviction for felony murder. We agree with the State.

11

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

12

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As it relates to this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . robbery." T.C.A. § 39-13-202(a)(2) (2014). The mental state required for the conviction was that the Defendant possessed the intent to commit the underlying offense, which in this case was the robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-202(b); § 39-13-401.

The evidence, viewed in the light most favorable to the State, proves that the Defendant planned and attempted to execute the robbery of the victim. The Defendant left his home that night to get money for "more weed." The Defendant and co-defendant, while armed, drove around Memphis searching for a possible victim. The Defendant and co-defendant discussed a robbery, and the Defendant called people on his cell phone asking about potential "licks." The Defendant used Ms. Norfleet's vehicle to drive to the downtown area where they found the victim and to flee the scene following the attempted robbery. The Defendant stopped the car near the victim, who was attempting to quickly walk away. The co-defendant, armed with the Defendant's gun, and the Defendant exited the vehicle, and the co-defendant shot and killed the victim. This is sufficient evidence upon which a jury could find beyond a reasonable doubt that the Defendant attempted to rob the victim with a gun and as a result, the victim was killed.

We conclude that during the course of the attempted robbery, the victim was shot and killed. The Defendant possessed the intent to commit the underlying offense, the robbery, and the victim was killed during the perpetration of the attempted robbery. Accordingly, we conclude the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of first degree murder in the perpetration of an attempted robbery. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

13

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE